**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **MILO H. SEGNER, JR.,** | § | |
| **Plaintiff,** | § | **Civil Action No. 3:10-cv-1884-F** |
| | § | |
| **v.** | § | |
| | § | |
| **SECURITIES AMERICA, INC.,** | § | |
| **et al.,** | § | |
| **Defendants.** | § | |

**PLAINTIFF'S FIRST AMENDED COMPLAINT**

**NOW COMES** Milo H. Segner, Jr., as Liquidating Trustee of the PR Liquidating Trust, and in any other legal capacities necessary to bring the causes of action herein, including but not limited to those alleged in paragraphs 8-10 hereof (the "Trustee"), and for his First Amended Complaint would show the Court as follows:

## I. SUMMARY OF ACTION

1. The Debtors[1] in these jointly administered bankruptcy cases were part of a massive Ponzi scheme designed to solicit large investments from unwitting investors. In the end, it appears that individual investors lost over $485 million between September 2006 and January 2009. The losses are staggering and tragic. But the real tragedy of the Debtors' collapse, however, is that it could have and should have been prevented. The Trustee, as representative of the PR Liquidating Trust, brings this lawsuit against certain broker-dealers that failed to

[1] The "Provident Debtors" or the "Debtors" are: Provident Royalties, LLC, Case No. 09-33886, Provident Operating Company, LLC, Case No. 09-33893, Somerset Lease Holdings, Inc., Case No. 09-33892, Somerset Development, Inc., Case No. 09-33912, Provident Energy 1, LP, Case No. 09-33888, Provident Resources 1, LP, Case No. 09-33887, Provident Energy 2, LP, Case No. 09-33894, Provident Energy 3, LP, Case No. 09-33899, Shale Royalties II, Inc., Case No. 09-33889, Shale Royalties 3, LLC, Case No. 09-33891, Shale Royalties 4, Inc., Case No. 09-33890, Shale Royalties 5, Inc., Case No. 09-33895, Shale Royalties 6, Inc., Case No. 09-33896, Shale Royalties 7, Inc., Case No. 09-33898, Shale Royalties 8, Inc., Case No. 09-33900, Shale Royalties 9, Inc., Case No. 09-33902, Shale Royalties 10, Inc., Case No. 09-33901, Shale Royalties 12, Inc., Case No. 09-33903, Shale Royalties 14, Inc., Case No. 09-33905, Shale Royalties 15, Inc., Case No. 09-33904, Shale Royalties 16, Inc., Case No. 09-33906, Shale Royalties 17, Inc., Case No. 09-33913, Shale Royalties 18, Inc., Case No. 09-33907, Shale Royalties 19, Inc., Case No. 09-33908, Shale Royalties 20, Inc., Case No. 09-33910, Shale Royalties 21, Inc., Case No. 09-33909, and Shale Royalties 22, Inc., Case No. 09-33911.

discharge their obligations properly and, as a consequence, permitted a massive financial injury to take place to Debtors and thousands of individual investors.

2. The Trustee is the lawful representative of the PR Liquidating Trust, which is the assignee of at least $251 million worth of claims from individual investors assigned to the PR Liquidating Trust pursuant to the terms of the Fourth Amended Consolidated Plan of Liquidation (the “Plan”). The Trustee brings this action to hold the broker-dealers accountable for the damages inflicted on hundreds of individual investors all across America. Broker-dealers stand in a fiduciary relationship with the investors they solicit and represent. The law recognizes these fiduciary obligations and imposes extremely high standards of conduct on those who control the financial fate of literally thousands of individuals. The broker-dealers failed miserably in upholding their fiduciary obligations.

3. The Trustee also brings claims under the Bankruptcy Code and state statutory law for the return of commission payments from these broker-dealers. Each commission payment to each broker-dealer constitutes an avoidable transfer under the Bankruptcy Code and state statutory law and must be repaid to the Debtors’ Estates (collectively the “Provident Royalties’ Bankruptcy Estate” or the “Estate”). Each avoidable payment was part of a scheme that was used to ensure that proper due diligence was not performed, that a reasonable investigation was not conducted and that information that would otherwise be important to individual investors and other interested third parties would not be disclosed. In other words, the commissions, fees and payments received from Provident Royalties encouraged and played a substantial role in the negligent and/or grossly negligent conduct of the broker-dealers.

## II. JURISIDICTION AND VENUE

4. This action was originally filed in the United States Bankruptcy Court for the Northern District of Texas, which had jurisdiction over the matter pursuant to 28 U.S.C. §§ 157

and 1334(b) because this action arises under, arises in and/or is related to Chapter 11 of the United States Bankruptcy Code ("Bankruptcy Code"). Various Defendants filed a Motion to Withdraw the Reference and an order was entered withdrawing the reference to the United States District Court for the Northern District of Texas. Accordingly, jurisdiction and venue are proper before this Court. In addition, this lawsuit raises claims arising under the laws of the United States. Therefore, this Court also has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331. The Court additionally has supplemental jurisdiction over the state law claims asserted herein in accordance with 28 U.S.C. § 1367.

5. This Court has personal jurisdiction over the Defendants named in this Complaint because the Defendants are alleged to have violated sections of Title 11 of the United States Bankruptcy Code and, therefore, are subject to personal jurisdiction and service under Bankruptcy Rule 7004 and Federal Rule of Civil Procedure 4(k)(1)(D).

6. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and/or 1409 because the above-captioned bankruptcy case is pending in this district. Venue is also proper in this district pursuant to 28 U.S.C. § 1391(a) because substantial acts in furtherance of the alleged misconduct and/or its effects occurred in this District, including the issuance of the materially false and misleading Private Placement Memorandums ("PPM"). Venue is also otherwise proper.

## III. PARTIES

### A. The Plaintiff.

7. Milo H. Segner, Jr. is the duly appointed and authorized Liquidating Trustee (the "Trustee") of the PR Liquidating Trust (the "Trust" or "PR Liquidating Trust") pursuant to the Fourth Amended Consolidated Plan of Liquidation for Debtors' Estates Under Chapter 11 of the United States Bankruptcy Court (the "Plan"). The Trustee brings this action in his capacity as

the Trustee, as the representative of the Trust, where necessary for and on behalf of the Trust, as the duly appointed and authorized representative of the Debtors' Estates (collectively the "Estate") pursuant to 11 U.S.C. § 1123(b)(3)(B), and in any and all other legal, equitable or actual capacities necessary to lawfully and appropriately bring all actions alleged which at one time or another resided with the Estate. In any and all such capacities, as necessary to bring any of these causes of action, Plaintiff is referred to as "Plaintiff" or "Trustee."

8. The Trustee further brings this action and asserts claims in his capacity as Trustee of the Trust that is the assignee of claims from holders of Class 6 Claims under the Plan assigned to the Trust. Pursuant to Section 4.6.3 of the Plan:

> Each holder of a Preferred Stock Interest in Class 6 under this Plan who submits a Ballot voting in favor of the Plan will, effective automatically as of the Effective Date and without the need for further action by any Person or the Bankruptcy Court, be deemed to have thereby assigned and transferred to the PR Liquidating Trust, for the collective benefit of PR Liquidating Trust beneficiaries, any and all rights, title, and interest in claims held by such holder against third parties, but solely to the extent that such claims relate to the holder's investment in one or more Debtors, and thereby to have appointed the Liquidating Trustee to be such holder's true and lawful attorney-in-fact as to such claims. Such assignment expressly includes, but is not limited to, claims held personally by any such holder, and following such assignment, the Liquidating Trustee shall have, without limitation, all standing to assert and pursue such claims that the assigning holder had prior to assigning its claim(s) to the PR Liquidating Trust, to the greatest extent permitted by law or equity.

**B. The Broker-Dealer Defendants.**

9. Defendant Lighthouse Capital Corp. ("Lighthouse") is a registered broker-dealer with its headquarters in Monterey, California. Lighthouse was properly served with service of process pursuant to Federal Rule of Bankruptcy Procedure 7004 and Federal Rule of Civil Procedure 4 through Robert J. Zamecki, its registered agent, at 659 Abrego Street, Suite 6, Monterey, California 93340.

10. Defendant CapWest Securities, Inc. ("CapWest") is a registered broker-dealer with its headquarters in Lakewood, Colorado. CapWest was a part of a national network of broker-dealers assembled by PAM, which was based in Texas. CapWest served as a broker-dealer for one or more of the Offerings and received commissions and due diligence fees for its sales of Provident Securities to investors. The Offerings were sold by means of PPMs that were prepared in Texas, and executed subscription agreements were sent to Texas for processing. The subscription agreements were accepted in Texas and the securities were issued from Texas. CapWest offered, sold or otherwise acted as a seller of Provident Securities to the aggrieved investors and acted in a fiduciary capacity to those members that purchased securities in the Offerings from them. CapWest is properly before the Court because it has appeared and filed a motion seeking relief.

11. Defendant NEXT Financial Group ("NEXT") is a registered broker-dealer with its headquarters in Houston, Texas. NEXT was a part of a national network of broker-dealers assembled by PAM, which was based in Texas. NEXT served as a broker-dealer for one or more of the Offerings and received commissions and due diligence fees for its sales of Provident Securities to investors. The Offerings were sold by means of PPMs that were prepared in Texas, and executed subscription agreements were sent to Texas for processing. The subscription agreements were accepted in Texas and the securities were issued from Texas. NEXT offered, sold or otherwise acted as a seller of Provident Securities to the aggrieved investors and acted in a fiduciary capacity to those members that purchased securities in the Offerings from them. NEXT is properly before the Court because it has appeared and filed a motion seeking relief.

12. Defendant Capital Financial Services, Inc. ("Capital Financial") is a registered broker-dealer with its headquarters in Minot, North Dakota. Capital Financial was a part of a

national network of broker-dealers assembled by PAM, which was based in Texas. Capital Financial served as a broker-dealer for one or more of the Offerings and received commissions and due diligence fees for its sales of Provident Securities to investors. The Offerings were sold by means of PPMs that were prepared in Texas, and executed subscription agreements were sent to Texas for processing. The subscription agreements were accepted in Texas and the securities were issued from Texas. Capital Financial offered, sold or otherwise acted as a seller of Provident Securities to the aggrieved investors and acted in a fiduciary capacity to those members that purchased securities in the Offerings from them. Capital Financial is properly before the Court because it has appeared and filed a motion seeking relief.

13. Defendant Workman Securities Corp. ("Workman") is a registered broker-dealer with its headquarters in Eden Prairie, Minnesota. Workman was a part of a national network of broker-dealers assembled by PAM, which was based in Texas. Workman served as a broker-dealer for one or more of the Offerings and received commissions and due diligence fees for its sales of Provident Securities to investors. The Offerings were sold by means of PPMs that were prepared in Texas, and executed subscription agreements were sent to Texas for processing. The subscription agreements were accepted in Texas and the securities were issued from Texas. Workman offered, sold or otherwise acted as a seller of Provident Securities to the aggrieved investors and acted in a fiduciary capacity to those members that purchased securities in the Offerings from them. Workman is properly before the Court because it has appeared and filed a motion seeking relief.

14. Defendant WFP Securities Corporation ("WFP") is a registered broker-dealer with its headquarters in San Diego, CA. WFP was a part of a national network of broker-dealers assembled by PAM, which was based in Texas. WFP served as a broker-dealer for one or more

of the Offerings and received commissions and due diligence fees for its sales of Provident Securities to investors. The Offerings were sold by means of PPMs that were prepared in Texas, and executed subscription agreements were sent to Texas for processing. The subscription agreements were accepted in Texas and the securities were issued from Texas. WFP offered, sold or otherwise acted as a seller of Provident Securities to the aggrieved investors and acted in a fiduciary capacity to those members that purchased securities in the Offerings from them. WFP is properly before the Court because it has appeared and filed a motion seeking relief.

15. Defendant AFA Financial Group, LLC ("AFA") is a registered broker-dealer with its headquarters in Calabasas, California. AFA was a part of a national network of broker-dealers assembled by PAM, which was based in Texas. AFA served as a broker-dealer for one or more of the Offerings and received commissions and due diligence fees for its sales of Provident Securities to investors. The Offerings were sold by means of PPMs that were prepared in Texas, and executed subscription agreements were sent to Texas for processing. The subscription agreements were accepted in Texas and the securities were issued from Texas. AFA offered, sold or otherwise acted as a seller of Provident Securities to the aggrieved investors and acted in a fiduciary capacity to those members that purchased securities in the Offerings from them. AFA was properly served with service of process pursuant to Federal Rule of Bankruptcy Procedure 7004 and Federal Rule of Civil Procedure 4 through Morrie Wolbrum Reiff, Chief Compliance Officer, at 26637 West Agoura Road, Calabasas, California 91302.

16. Defendant National Securities Corporation ("National Securities") is a registered broker-dealer with its headquarters in Seattle, Washington. National Securities was a part of a national network of broker-dealers assembled by PAM, which was based in Texas. National Securities served as a broker-dealer for one or more of the Offerings and received commissions

and due diligence fees for its sales of Provident Securities to investors. The Offerings were sold by means of PPMs that were prepared in Texas, and executed subscription agreements were sent to Texas for processing. The subscription agreements were accepted in Texas and the securities were issued from Texas. National Securities offered, sold or otherwise acted as a seller of Provident Securities to the aggrieved investors and acted in a fiduciary capacity to those members that purchased securities in the Offerings from them. National Securities is properly before the Court because it has appeared and filed a motion seeking relief.

17. Defendant Chester Harris & Co. ("Chester Harris") is a registered broker-dealer with its headquarters in White Plains, New York. Chester Harris was a part of a national network of broker-dealers assembled by PAM, which was based in Texas. Chester Harris served as a broker-dealer for one or more of the Offerings and received commissions and due diligence fees for its sales of Provident Securities to investors. The Offerings were sold by means of PPMs that were prepared in Texas, and executed subscription agreements were sent to Texas for processing. The subscription agreements were accepted in Texas and the securities were issued from Texas. Chester Harris offered, sold or otherwise acted as a seller of Provident Securities to the aggrieved investors and acted in a fiduciary capacity to those members that purchased securities in the Offerings from them. Chester Harris is properly before the Court because it has appeared and filed a motion seeking relief.

18. Defendant Meadowbrook Securities, LLC, f/k/a Investlinc Securities ("Meadowbrook") is a registered broker-dealer with its headquarters in Jackson, Mississippi. Meadowbrook was a part of a national network of broker-dealers assembled by PAM, which was based in Texas. Meadowbrook served as a broker-dealer for one or more of the Offerings and received commissions and due diligence fees for its sales of Provident Securities to investors.

The Offerings were sold by means of PPMs that were prepared in Texas, and executed subscription agreements were sent to Texas for processing. The subscription agreements were accepted in Texas and the securities were issued from Texas. Meadowbrook offered, sold or otherwise acted as a seller of Provident Securities to the aggrieved investors and acted in a fiduciary capacity to those members that purchased securities in the Offerings from them. Meadowbrook was properly served with service of process pursuant to Federal Rule of Bankruptcy Procedure 7004 and Federal Rule of Civil Procedure 4 through Leroy Henry Paris, II, its registered agent, at 120 N. Congress, Suite 400, Jackson, Mississippi 39201.

19. Defendant Dewaay Financial Network ("Dewaay") is a registered broker-dealer with its headquarters in Clive, Iowa. Dewaay was a part of a national network of broker-dealers assembled by PAM, which was based in Texas. Dewaay served as a broker-dealer for one or more of the Offerings and received commissions and due diligence fees for its sales of Provident Securities to investors. The Offerings were sold by means of PPMs that were prepared in Texas, and executed subscription agreements were sent to Texas for processing. The subscription agreements were accepted in Texas and the securities were issued from Texas. Dewaay offered, sold or otherwise acted as a seller of Provident Securities to the aggrieved investors and acted in a fiduciary capacity to those members that purchased securities in the Offerings from them. Dewaay is properly before the Court because it has appeared and filed a motion seeking relief.

20. Defendant Boogie Investment Group, Inc. ("Boogie") is a registered broker-dealer with its headquarters in Melbourne, Florida. Boogie was a part of a national network of broker-dealers assembled by PAM, which was based in Texas. Boogie served as a broker-dealer for one or more of the Offerings and received commissions and due diligence fees for its sales of Provident Securities to investors. The Offerings were sold by means of PPMs that were prepared

in Texas, and executed subscription agreements were sent to Texas for processing. The subscription agreements were accepted in Texas and the securities were issued from Texas. Boogie offered, sold or otherwise acted as a seller of Provident Securities to the aggrieved investors and acted in a fiduciary capacity to those members that purchased securities in the Offerings from them. Boogie is properly before the Court because it has appeared and filed a motion seeking relief.

21. Defendant Securities Network, LLC ("Securities Network") is a registered broker-dealer with its headquarters in Norcross, Georgia. Securities Network was a part of a national network of broker-dealers assembled by PAM, which was based in Texas. Securities Network served as a broker-dealer for one or more of the Offerings and received commissions and due diligence fees for its sales of Provident Securities to investors. The Offerings were sold by means of PPMs that were prepared in Texas, and executed subscription agreements were sent to Texas for processing. The subscription agreements were accepted in Texas and the securities were issued from Texas. Securities Network offered, sold or otherwise acted as a seller of Provident Securities to the aggrieved investors and acted in a fiduciary capacity to those members that purchased securities in the Offerings from them. Securities Network is properly before the Court because it has appeared and filed a motion seeking relief.

22. Defendant Summit Brokerage Services, Inc. ("Summit") is a registered broker-dealer with its headquarters in Boca Raton, Florida. Summit was a part of a national network of broker-dealers assembled by PAM, which was based in Texas. Summit served as a broker-dealer for one or more of the Offerings and received commissions and due diligence fees for its sales of Provident Securities to investors. The Offerings were sold by means of PPMs that were prepared in Texas, and executed subscription agreements were sent to Texas for processing. The

subscription agreements were accepted in Texas and the securities were issued from Texas. Summit offered, sold or otherwise acted as a seller of Provident Securities to the aggrieved investors and acted in a fiduciary capacity to those members that purchased securities in the Offerings from them. Summit is properly before the Court because it has appeared and filed a motion seeking relief.

23. Defendant Brookstone Securities, Inc. ("Brookstone") is a registered broker-dealer with its headquarters in Lakeland, Florida. Brookstone was a part of a national network of broker-dealers assembled by PAM, which was based in Texas. Brookstone served as a broker-dealer for one or more of the Offerings and received commissions and due diligence fees for its sales of Provident Securities to investors. The Offerings were sold by means of PPMs that were prepared in Texas, and executed subscription agreements were sent to Texas for processing. The subscription agreements were accepted in Texas and the securities were issued from Texas. Brookstone offered, sold or otherwise acted as a seller of Provident Securities to the aggrieved investors and acted in a fiduciary capacity to those members that purchased securities in the Offerings from them. Brookstone is properly before the Court because it has appeared and filed a motion seeking relief.

24. Defendant American Portfolios Financial Services, Inc. ("American Portfolios") is a registered broker-dealer with its headquarters in Holbrook, New York. American Portfolios was a part of a national network of broker-dealers assembled by PAM, which was based in Texas. American Portfolios served as a broker-dealer for one or more of the Offerings and received commissions and due diligence fees for its sales of Provident Securities to investors. The Offerings were sold by means of PPMs that were prepared in Texas, and executed subscription agreements were sent to Texas for processing. The subscription agreements were

accepted in Texas and the securities were issued from Texas. American Portfolios offered, sold or otherwise acted as a seller of Provident Securities to the aggrieved investors and acted in a fiduciary capacity to those members that purchased securities in the Offerings from them. American Portfolios is properly before the Court because it has appeared and filed a motion seeking relief.

25. Defendant Advisor Group Equity Services, Ltd. ("AGES") is a registered broker-dealer with its headquarters in Reading, Massachusetts. AGES was a part of a national network of broker-dealers assembled by PAM, which was based in Texas. AGES served as a broker-dealer for one or more of the Offerings and received commissions and due diligence fees for its sales of Provident Securities to investors. The Offerings were sold by means of PPMs that were prepared in Texas, and executed subscription agreements were sent to Texas for processing. The subscription agreements were accepted in Texas and the securities were issued from Texas. AGES offered, sold or otherwise acted as a seller of Provident Securities to the aggrieved investors and acted in a fiduciary capacity to those members that purchased securities in the Offerings from them. AGES is properly before the Court because it has appeared and filed a motion seeking relief.

26. Defendant Eagle One Investments, LLC ("Eagle One") is a registered broker-dealer with its headquarters in Washington, Iowa. Eagle One was a part of a national network of broker-dealers assembled by PAM, which was based in Texas. Eagle One served as a broker-dealer for one or more of the Offerings and received commissions and due diligence fees for its sales of Provident Securities to investors. The Offerings were sold by means of PPMs that were prepared in Texas, and executed subscription agreements were sent to Texas for processing. The subscription agreements were accepted in Texas and the securities were issued from Texas.

Eagle One offered, sold or otherwise acted as a seller of Provident Securities to the aggrieved investors and acted in a fiduciary capacity to those members that purchased securities in the Offerings from them. Eagle One is properly before the Court because it has appeared and filed a motion seeking relief.

27. Defendant Questar Capital Corp. ("Questar") is a registered broker-dealer with its headquarters in Minneapolis, Minnesota. Questar was a part of a national network of broker-dealers assembled by PAM, which was based in Texas. Questar served as a broker-dealer for one or more of the Offerings and received commissions and due diligence fees for its sales of Provident Securities to investors. The Offerings were sold by means of PPMs that were prepared in Texas, and executed subscription agreements were sent to Texas for processing. The subscription agreements were accepted in Texas and the securities were issued from Texas. Questar offered, sold or otherwise acted as a seller of Provident Securities to the aggrieved investors and acted in a fiduciary capacity to those members that purchased securities in the Offerings from them. Questar is properly before the Court because it has appeared and filed a motion seeking relief.

28. Defendant First Allied Securities, Inc. ("First Allied") is a registered broker-dealer with its headquarters in San Diego, California. First Allied was a part of a national network of broker-dealers assembled by PAM, which was based in Texas. First Allied served as a broker-dealer for one or more of the Offerings and received commissions and due diligence fees for its sales of Provident Securities to investors. The Offerings were sold by means of PPMs that were prepared in Texas, and executed subscription agreements were sent to Texas for processing. The subscription agreements were accepted in Texas and the securities were issued from Texas. First Allied offered, sold or otherwise acted as a seller of Provident Securities to the

aggrieved investors and acted in a fiduciary capacity to those members that purchased securities in the Offerings from them. First Allied was properly served with service of process pursuant to Federal Rule of Bankruptcy Procedure 7004 and Federal Rule of Civil Procedure 4 through Adam Marion Vomhof, its registered agent, at 655 West Broadway, 11th Floor, San Diego, California 92101.

29. Defendant Newport Coast Securities, Inc. f/k/a Grant Bettingen, Inc. ("Grant Bettingen") is a registered broker-dealer with its headquarters in Irvine, California. Grant Bettingen was a part of a national network of broker-dealers assembled by PAM, which was based in Texas. Grant Bettingen served as a broker-dealer for one or more of the Offerings and received commissions and due diligence fees for its sales of Provident Securities to investors. The Offerings were sold by means of PPMs that were prepared in Texas, and executed subscription agreements were sent to Texas for processing. The subscription agreements were accepted in Texas and the securities were issued from Texas. Grant Bettingen offered, sold or otherwise acted as a seller of Provident Securities to the aggrieved investors and acted in a fiduciary capacity to those members that purchased securities in the Offerings from them. Grant Bettingen is before the Court because it has appeared and filed a motion for relief.

30. Defendant Sterling Enterprises Group, Inc. ("Sterling") is a registered broker-dealer with its headquarters in St. Petersburg, Florida. Sterling was a part of a national network of broker-dealers assembled by PAM, which was based in Texas. Sterling served as a broker-dealer for one or more of the Offerings and received commissions and due diligence fees for its sales of Provident Securities to investors. The Offerings were sold by means of PPMs that were prepared in Texas, and executed subscription agreements were sent to Texas for processing. The subscription agreements were accepted in Texas and the securities were issued from Texas.

Sterling offered, sold or otherwise acted as a seller of Provident Securities to the aggrieved investors and acted in a fiduciary capacity to those members that purchased securities in the Offerings from them. Sterling was properly served with service of process pursuant to Federal Rule of Bankruptcy Procedure 7004 and Federal Rule of Civil Procedure 4 through John R. Kiefner, Jr., its registered agent, at 146 2nd St. N., Suite 300, St. Petersburg, Florida 33701.

31. Defendant WFG Investments, Inc. ("WFG") is a registered broker-dealer with its headquarters in Dallas, Texas. WFG was a part of a national network of broker-dealers assembled by PAM, which was based in Texas. WFG served as a broker-dealer for one or more of the Offerings and received commissions and due diligence fees for its sales of Provident Securities to investors. The Offerings were sold by means of PPMs that were prepared in Texas, and executed subscription agreements were sent to Texas for processing. The subscription agreements were accepted in Texas and the securities were issued from Texas. WFG offered, sold or otherwise acted as a seller of Provident Securities to the aggrieved investors and acted in a fiduciary capacity to those members that purchased securities in the Offerings from them. WFG is properly before the Court because it has appeared and filed a motion seeking relief.

32. Defendant Crescent Securities Group, Inc. ("Crescent") is a registered broker-dealer with its headquarters in Dallas, Texas. Crescent was a part of a national network of broker-dealers assembled by PAM, which was based in Texas. Crescent served as a broker-dealer for one or more of the Offerings and received commissions and due diligence fees for its sales of Provident Securities to investors. The Offerings were sold by means of PPMs that were prepared in Texas, and executed subscription agreements were sent to Texas for processing. The subscription agreements were accepted in Texas and the securities were issued from Texas. Crescent offered, sold or otherwise acted as a seller of Provident Securities to the aggrieved

investors and acted in a fiduciary capacity to those members that purchased securities in the Offerings from them. Crescent was properly served with service of process pursuant to Federal Rule of Bankruptcy Procedure 7004 and Federal Rule of Civil Procedure 4 through Travis Nick Duren, its President, at 8750 North Central Expressway, Suite 750, Dallas, Texas 75231.

33. Defendant David Harris & Co., Inc. ("David Harris") is a registered broker-dealer with its headquarters in White Plains, New York. David Harris was a part of a national network of broker-dealers assembled by PAM, which was based in Texas. David Harris served as a broker-dealer for one or more of the Offerings and received commissions and due diligence fees for its sales of Provident Securities to investors. The Offerings were sold by means of PPMs that were prepared in Texas, and executed subscription agreements were sent to Texas for processing. The subscription agreements were accepted in Texas and the securities were issued from Texas. David Harris offered, sold or otherwise acted as a seller of Provident Securities to the aggrieved investors and acted in a fiduciary capacity to those members that purchased securities in the Offerings from them. David Harris was properly served with service of process pursuant to Federal Rule of Bankruptcy Procedure 7004 and Federal Rule of Civil Procedure 4 David Alan Harris, President and Chief Compliance Officer, 222 Mamaroneck Avenue, White Plains, New York 10605 or P.O. Box 668, White Plains, New York 10602.

34. Defendant Matheson Securities, L.L.C. ("Matheson") is a registered broker-dealer with its headquarters in Estero, Florida. Matheson was a part of a national network of broker-dealers assembled by PAM, which was based in Texas. Matheson served as a broker-dealer for one or more of the Offerings and received commissions and due diligence fees for its sales of Provident Securities to investors. The Offerings were sold by means of PPMs that were prepared in Texas, and executed subscription agreements were sent to Texas for processing. The

subscription agreements were accepted in Texas and the securities were issued from Texas. Matheson offered, sold or otherwise acted as a seller of Provident Securities to the aggrieved investors and acted in a fiduciary capacity to those members that purchased securities in the Offerings from them. Matheson was properly served with service of process pursuant to Federal Rule of Bankruptcy Procedure 7004 and Federal Rule of Civil Procedure 4 through Robert Paul Matheson, its registered agent, at 23160 Fashion Drive, Suite 225, Estero, Florida 33928

35. Defendant Wedbush Morgan Securities, Inc. ("Wedbush") is a registered broker-dealer with its headquarters in Los Angeles, California. Wedbush was a part of a national network of broker-dealers assembled by PAM, which was based in Texas. Wedbush served as a broker-dealer for one or more of the Offerings of Provident Securities to investors. The Offerings were sold by means of PPMs that were prepared in Texas, and executed subscription agreements were sent to Texas for processing. The subscription agreements were accepted in Texas and the securities were issued from Texas. Wedbush offered, sold or otherwise acted as a seller of Provident Securities to the aggrieved investors and acted in a fiduciary capacity to those members that purchased securities in the Offerings from them. Wedbush is properly before the Court because it has appeared and filed a motion seeking relief.

36. Defendant Investors Capital Corp. ("Investors Capital") is a registered broker-dealer with its headquarters in Lynnfield, Massachusetts. Investors Capital was properly served with service of process pursuant to Federal Rule of Bankruptcy Procedure 7004 and Federal Rule of Civil Procedure 4 through Douglas C. Leonard, its resident agent, at 230 Broadway East, Suite 203, Lynnfield, Massachusetts 01940-2320.

## IV. BANKRUPT DEFENDANTS SUBJECT TO AUTOMATIC STAY

37. Defendant QA3 Financial Corp. ("QA3") is a registered broker-dealer with its headquarters in Omaha, Nebraska. QA3 is properly before the Court because it has appeared and

filed a motion seeking relief. QA3 has filed for bankruptcy protection in Omaha, Nebraska and the suit is presently stayed against QA3 pursuant to 11 U.S.C. § 362.

38. Defendant Okoboji Financial Services, Inc. ("Okoboji") is a registered broker-dealer with its headquarters in Okoboji, Iowa. Okoboji was properly served with service of process pursuant to Federal Rule of Bankruptcy Procedure 7004 and Federal Rule of Civil Procedure 4 through Ralph Roberts Schneider, its registered agent, at Dixon's Beach, P.O. Box 289, Okoboji, Iowa 51355. After the Trustee filed and served the Original Complaint, Okoboji filed for bankruptcy protection. The Trustee never received notice of the bankruptcy. The Trustee believes that the action against Okoboji is stayed pursuant to 11 U.S.C. § 362.

39. Defendant Empire Financial Group, Inc. ("Empire") is a registered broker-dealer with its headquarters in Longwood, Florida. Empire was properly served with service of process pursuant to Federal Rule of Bankruptcy Procedure 7004 and Federal Rule of Civil Procedure 4 through Vlad Uchenik, CFO and Chief Operations Officer, 2170 West State Road 434, Suite 100, Longwood, Florida 32779. On information and belief, after the Trustee filed and served the Original Complaint, Empire filed for bankruptcy protection. The Trustee never received notice of the bankruptcy case. The Trustee believes that the action against Empire is stayed pursuant to 11 U.S.C. § 362.

40. Defendant Jesup & Lamont Securities Corp. ("Jesup") is a registered broker-dealer with its headquarters in New York, New York. Jesup was properly served with service of process pursuant to Federal Rule of Bankruptcy Procedure 7004 and Federal Rule of Civil Procedure 4 through William Moreno, its registered agent, at 650 Fifth Avenue, 3d Floor, New York, New York 10019. On information and belief, after the Trustee filed and served the Original Complaint, Jesup filed for bankruptcy protection. The Trustee never received notice of

the bankruptcy. The Trustee believes that the action against Jesup is stayed pursuant to 11 U.S.C. § 362.

41. Defendant Private Asset Group, Inc. ("PAG") is a registered broker-dealer with its headquarters in Costa Mesa, California. PAG was properly served with service of process pursuant to Federal Rule of Bankruptcy Procedure 7004 and Federal Rule of Civil Procedure 4 through Burke Ambrose Dambly, its registered agent, at 3070 Bristol Street, Suite 500, Costa Mesa, California 92626. An entry of default was entered by the Clerk of the Court because PAG has failed to appear. However, PAG subsequently filed for bankruptcy protection and the action against it is currently stayed pursuant to 11 U.S.C. § 362.

42. Defendant E-Planning.Com Securities, Inc. ("E-Planning") is a registered broker-dealer with its headquarters in Roseville, California. E-Planning was properly served with service of process pursuant to Federal Rule of Bankruptcy Procedure 7004 and Federal Rule of Civil Procedure 4 through Scott Layne Hultsman at 3721 Douglas Boulevard, Suite 200, Roseville, California 95661. On information and belief, E-Planning filed for bankruptcy protection after the Original Adversary Complaint was filed and served; however, the Trustee has never received notice of the bankruptcy case. The Trustee believes the action against E-Planning is stayed pursuant to 11 U.S.C. § 362.

43. Defendant Harrison Douglas, Inc. ("Harrison") is a registered broker-dealer with its headquarters in Aurora, Colorado. Harrison was properly served with service of process pursuant to Federal Rule of Bankruptcy Procedure 7004 and Federal Rule of Civil Procedure 4 through Douglas Wayne Schriner, its registered agent, at 3025 South Parker Road, Suite 801, Aurora, Colorado 80014. Harrison Douglas filed for bankruptcy in July of 2011 and the action is currently stayed against them pursuant to 11 U.S.C. § 362.

## V. DEFAULTED DEFENDANTS

44. Defendant United Equity Securities, LLC ("United Equity") is a registered broker-dealer with its headquarters in Houston, Texas. United Equity was properly served with service of process pursuant to Federal Rule of Bankruptcy Procedure 7004 and Federal Rule of Civil Procedure 4 through Larry Ivan Behrends, its President, at 10700 Richmond Avenue, Suite 252, Houston, Texas 77042. An entry of default was entered by the Clerk of the Court because United Equity has failed to appear. The Trustee will be pursuing a final default judgment.

45. Defendant Barron Moore, Inc. ("Barron") is a registered broker-dealer with its headquarters in Dallas, Texas. Barron was properly served with service of process pursuant to Federal Rule of Bankruptcy Procedure 7004 and Federal Rule of Civil Procedure 4 through Katherine A. Moore, its registered agent, at 3710 Rawlins Street, Suite 800, Dallas, Texas 75219 or at 381 Casa Linda Plaza, PMB 138, Dallas, Texas 75218. An entry of default was entered by the Clerk of the Court because Barron has failed to appear. The Trustee will be pursuing a final default judgment.

46. Defendant Newbridge Securities Corp. ("Newbridge") is a registered broker-dealer with its headquarters in Fort Lauderdale, Florida. Newbridge was properly served with service of process pursuant to Federal Rule of Bankruptcy Procedure 7004 and Federal Rule of Civil Procedure 4 through Robert P. Spitler, its registered agent, at 1451 Cypress Creek Road, Suite 204, Fort Lauderdale, Florida 33309. An entry of default was entered by the Clerk of the Court because Newbridge has failed to appear. The Trustee will be pursuing a final default judgment.

47. Defendant Waterford Investor Services, Inc. ("Waterford") is a registered broker-dealer with its headquarters in Clearwater, Florida. Waterford was properly served with service of process pursuant to Federal Rule of Bankruptcy Procedure 7004 and Federal Rule of Civil

Procedure 4 through CT Corporate System, its registered agent, at 1200 South Pine Island Road, Plantation, Florida 33324. An entry of default was entered by the Clerk of the Court because Waterford has failed to appear. The Trustee will be pursuing a final default judgment.

48. Defendant VCROSS Capital Markets, LLC f/k/a Asset Management Strategies, LLC ("VCROSS") is a registered broker-dealer with its headquarters in Greenwich, Connecticut. VCROSS was properly served with service of process pursuant to Federal Rule of Bankruptcy Procedure 7004 and Federal Rule of Civil Procedure 4 through CT Corporation System, its registered agent, at One Corporate Center, 11th Floor, Hartford, Connecticut 06103-3220. An entry of default was entered by the Clerk of the Court because VCROSS has failed to appear. The Trustee will be pursuing a final default judgment.

49. Defendant Main Street Securities ("Main Street") is a registered broker-dealer with its headquarters in Hays, Kansas. Main Street was properly served with service of process pursuant to Federal Rule of Bankruptcy Procedure 7004 and Federal Rule of Civil Procedure 4 through Bobb Arthur Meckenstock, its registered agent, at 1407 Main Street, Hays, Kansas. An entry of default was entered by the Clerk of the Court because Main Street has failed to appear. The Trustee will be pursuing a final default judgment.

50. Defendant United Securities Alliance, Inc. ("United Securities") is a registered broker-dealer with its headquarters in Greenwood Village, Colorado. United Securities was properly served with service of process pursuant to Federal Rule of Bankruptcy Procedure 7004 and Federal Rule of Civil Procedure 4 through Corporation Service Company, its registered agent, at 1560 Broadway, Suite 2090, Denver, Colorado 80202. An entry of default was entered by the Clerk of the Court because United Securities has failed to appear. The Trustee will be pursuing a final default judgment.

51. Defendant Community Bankers Securities, LLC ("Community Bankers") is a registered broker-dealer with its headquarters in Richmond, Virginia. Community Bankers was properly served with service of process pursuant to Federal Rule of Bankruptcy Procedure 7004 and Federal Rule of Civil Procedure 4 through CT Corporation System, its resident agent, at 4701 Cox Road, Suite 301, Glen Allen, Virginia 23060. An entry of default was entered by the Clerk of the Court because Community Bankers has failed to appear. The Trustee will be pursuing a final default judgment.

## VI. CURRENTLY SETTLED OR SETTLING DEFENDANTS

52. Securities America, Inc. ("Securities America") is a registered broker-dealer with its headquarters in La Vista, Nebraska. Securities America has settled its claims with the Trustee and is no longer a Defendant.

53. Defendant Ausdal Financial Partners, Inc. ("Ausdal") is a registered broker-dealer with its headquarters in Davenport, Iowa. Ausdal was properly served with service of process pursuant to Federal Rule of Bankruptcy Procedure 7004 and Federal Rule of Civil Procedure 4 through Robert Burns Ausdal, Jr., its registered agent, at 220 North Main Street, Suite 400, Davenport, Iowa 52801-1921. Ausdal and the Trustee are in the process of finalizing a settlement agreement.

54. Defendant Calton & Associates, Inc. ("Calton") is a registered broker-dealer with its headquarters in Tampa, Florida. Calton was properly served with service of process pursuant to Federal Rule of Bankruptcy Procedure 7004 and Federal Rule of Civil Procedure 4 through Derek J Calton, its registered agent, at 14497 North Dale Mabry Highway, Suite 215, Tampa, Florida 33618. Calton and the Trustee are in the process of finalizing a settlement agreement.

55. Defendant Westpark Capital, Inc. ("Westpark") is a registered broker-dealer with its headquarters in Los Angeles, California. Westpark was properly served with service of

process pursuant to Federal Rule of Bankruptcy Procedure 7004 and Federal Rule of Civil Procedure 4 through Richard Rappaport, its registered agent, at 1900 Avenue of the Stars, Suite 310, Los Angeles, California 90067. Westpark and the Trustee are in the process of finalizing a settlement agreement.

56. Defendant Callaway Financial Services, Inc. ("Callaway") is a registered broker-dealer with its headquarters in Arlington, Texas. Callaway is properly before the Court because it has appeared and filed a motion seeking relief. Callaway has settled with the Trustee, and an Agreed Judgment has been entered.

57. Defendant Milkie Ferguson Investments, Inc. ("Milkie Ferguson") is a registered broker-dealer with its headquarters in Dallas, Texas. Milkie Ferguson has settled with the Trustee and is no longer a Defendant.

58. Defendant Kaiser & Company ("Kaiser") is a registered broker-dealer with its headquarters in Cheyenne, Wyoming. Kaiser is properly before the Court because it has appeared and filed a motion seeking relief. Kaiser and the Trustee are in the process of finalizing a settlement agreement.

59. Collectively, all of the foregoing Defendants are referred to herein as the "Broker Defendants." If the foregoing Broker Defendants have completed a settlement with the Trustee and an order dismissing the claims against them with prejudice has been entered, then the following allegations and causes of action are not applicable to those settled Defendants.

## VII. NON-PARTIES

60. HHBC Enterprise, LP ("HHBC") is a Delaware limited partnership with its principal place of business in Dallas, Texas. HHBC is an affiliate of Brendan W. Coughlin ("Coughlin") and Henry D. Harrison ("Harrison"). HHBC owns 6,975 LLC units, or 69.75% of Provident Royalties.

61. WPCO, LLC ("WPCO") is a limited liability company with its principal place of business in Dallas, Texas. Paul R. Melbye ("Melbye") and Jeanine Melbye are managing members of WPCO. WPCO owns 2,500 LLC units, or 25%, of Provident Royalties.

62. Melbye, a Dallas, Texas resident, is a founder and manager of Provident Royalties. Melbye is a principal of each Rule 506 Entity (as defined below), and is the principal in charge of operations for Provident Royalties.

63. Coughlin, a Dallas, Texas resident, is a founder and manager of Provident Royalties. Harrison is also a managing partner of Provident Asset Management, LLC ("PAM") and a principal of each Rule 506 Entity.

64. The Private Placement Memorandums ("PPM") that were provided to and formed the basis for soliciting investors into the Provident Royalties scheme identified Melbye, Coughlin and Harrison as "management" of each Rule 506 Entity.

65. Joseph Blimline ("Blimline"), a Dallas, Texas resident, is a founder and manager of Provident Royalties. Blimline was also a manager, employee, and consultant to Provident Royalties. On March 7, 2006, Blimline entered into a Consent Order and Stipulation with the State of Michigan, Department of Labor & Economic Growth, Office of Financial and Insurance Services (the "Michigan DOL") in connection with an offering of unregistered securities by a Nevada corporation of which he was an officer and director, Longhorn Energy Corporation. Blimline agreed to pay a civil penalty in the amount of $1,000. Several months later, Blimline was ordered by the Michigan DOL to cease and desist in connection with another offering of unregistered securities by another Nevada corporation of which he was an officer and director, Jordan River Resources. Blimline was ordered to pay a civil penalty in the amount of $1,000.

66. On August 31, 2010, Blimline pled guilty to criminal violations of 18 U.S.C. § 1341 in connection with his role in the Provident Ponzi Scheme. *See* Blimline Criminal Plea Documents in *United States of America v. Joseph Blimline*, Case No. 4:10 CR-137, in the United States District Court for the Eastern District of Texas. In his guilty plea, Blimline admitted that:

- He was a key employee of Provident Royalties;
- He was a control person of Provident Royalties;
- Provident Royalties raised money from investors from September 2006 through February 1, 2009;
- Provident Royalties solicited investments through Private Placement Memoranda ("PPMs");
- The PPMs represented that proceeds raised by one PPM Project would not be used to pay dividends for any other PPM Project;
- Provident used investor funds from some PPM Projects to pay dividends in other PPM Projects;
- Provident Royalties entered into almost $93 million in transactions with an entity controlled by Blimline, including extending approximately $30 million in unsecured loans to Blimline; and
- Based on the false material representations and omissions of material fact made by Provident, approximately 7,700 investors provided in excess of $485 million in investment funds to Provident Royalties.

67. HHBC, WPCO, Melbye, Coughlin, Harrison and Blimline are collectively referred to herein as the "Provident Management Group." The Provident Management Group is not named as a defendant in this action due to the Order Granting Temporary Restraining Order, Appointing Receiver, Freezing Assets, Staying Litigation, Prohibiting the Destruction of Documents and Accelerating Discovery, dated July 2, 2009 (the "Order Appointing Receiver").

68. Provident Royalties is a Delaware limited liability company with its principal office in Dallas, Texas. Two companies, WPCO and HHBC, hold the majority of interests in Provident Royalties. Provident Royalties is a beneficial owner in each of the numerous affiliated

entities (the Rule 506 Entities as defined below) that issued the Provident Securities sold to investors.

69. Provident Asset Management, LLC ("PAM") is a Delaware limited liability company with its principal office in Dallas, Texas. PAM was formed in 2002 and is a member of FINRA and Securities Investor Protection Corporation ("SIPC"). PAM has been registered with the SEC as a broker-dealer since 2004, and focuses on investments in the energy sector and specializes in direct participation programs and private placements. Coughlin and Harrison are the principals of PAM, which served as the Managing Dealer for a series of offers and sales of approximately $485 million of oil and gas investments to investors across the country (the "Offerings") and organized a syndicate of broker-dealers (including the Broker Defendants) to enter into placement agreements to offer and sell securities in the Offerings. PAM was previously known as AmTex Associates, LLC ("AmTex") and certain of the Offerings were sold through AmTex. References to PAM include AmTex.

70. Provident Royalties and PAM raised funds from investors by creating a series of business entities that issued securities (hereafter, "Provident Securities") under SEC Rule 506 of Regulation D (the "Rule 506 Entities"). The Provident Securities purportedly were exempt from the registration requirement of the Securities Act of 1933. All of the Rule 506 Entities maintained their headquarters in Provident Royalties' offices in Dallas, Texas. The Rule 506 Entities include:

a. Provident Resources 1, LP, a Dallas, Texas-based limited partnership that raised approximately $9.1 million from 214 investors, beginning in March 2007. The directors and executive officers of Provident Resources 1 are Melbye, Coughlin and Harrison;

b. Provident Energy 1, LP, a Dallas, Texas-based limited partnership that raised approximately $7.2 million from 131 investors, beginning in March 2007. The directors and executive officers of Provident Energy 1 are Melbye, Coughlin and Harrison;

c. Provident Energy 2, LP, a Dallas, Texas-based limited partnership that raised approximately $25.9 million from 498 investors, beginning in November 2007. The directors and executive officers of Provident Energy 2 are Melbye, Coughlin, Harrison, Robert Y. Jordan ("Jordan") and W. Mark Miller ("Miller");

d. Provident Energy 3, LP, a Dallas, Texas-based limited partnership that raised approximately $120,000 from 4 investors. The directors and executive officers of Provident Energy 3 are Melbye, Coughlin and Harrison;

e. Shale Royalties II, Inc. ("Shale II"), a Dallas, Texas-based corporation that raised approximately $9.7 million from 177 investors, beginning in September 2006. The directors and executive officers of Shale II are Melbye, Coughlin, Harrison and Darin Davis ("Davis"). Melbye is also a beneficial owner of Shale II;

f. Shale Royalties 3, LLC ("Shale 3"), a Dallas, Texas-based Delaware limited liability company that raised approximately $20 million from 339 investors, beginning in January 2007. The directors and executive officers of Shale 3 are Melbye, Coughlin, Harrison and Davis. Melbye is also a beneficial owner of Shale 3;

g. Shale Royalties 4, Inc. ("Shale 4"), a Dallas, Texas-based Delaware corporation that raised approximately $27.4 million from 487 investors, beginning in March 2007. The directors and executive officers of Shale 4 are Melbye, Coughlin, and Harrison. Coughlin and Harrison are also beneficial owners of Shale 4;

h. Shale Royalties 5, Inc. ("Shale 5"), a Dallas, Texas-based Delaware corporation that raised approximately $29.94 million from 499 investors, beginning in May 2007. The directors of Shale 5 are Melbye, Coughlin, and Harrison. The executive officers of Shale 5 are Melbye, Coughlin, Harrison and Jordan. Melbye, Coughlin and Harrison are also beneficial owners of Shale 5;

i. Shale Royalties 6, Inc. ("Shale 6"), a Dallas, Texas-based Delaware corporation that raised approximately $27.4 million from 493 investors, beginning in November 2007. The directors of Shale 6 are Melbye, Coughlin and Harrison. The executive officers of Shale 6 are Melbye, Coughlin, Harrison, Jordan and Miller. Melbye, Coughlin and Harrison are also beneficial owners of Shale 6;

j. Shale Royalties 7, Inc. ("Shale 7"), a Dallas, Texas-based Delaware corporation that raised approximately $31.3 million from 494 investors, beginning in December 2007. The directors of Shale 7 are Melbye, Coughlin, and Harrison. The executive officers of Shale 7 are Melbye,

Coughlin, Harrison, Jordan and Miller. Melbye, Coughlin and Harrison are also beneficial owners of Shale 7;

k. Shale Royalties 8, Inc. ("Shale 8"), a Dallas, Texas-based Delaware corporation that raised approximately $31.8 million from 497 investors, beginning in December 2007. The directors of Shale 8 are Melbye, Coughlin, and Harrison. The executive officers of Shale 8 are Melbye, Coughlin, Harrison, Jordan and Miller. Melbye, Coughlin and Harrison are also beneficial owners of Shale 8;

l. Shale Royalties 9, Inc. ("Shale 9"), a Dallas, Texas-based Delaware corporation that raised approximately $33.2 million from 499 investors, beginning in February 2008. The directors of Shale 9 are Melbye, Coughlin, and Harrison. The executive officers of Shale 9 are Melbye, Coughlin, Harrison, Jordan and Miller. Melbye, Coughlin and Harrison are also beneficial owners of Shale 9;

m. Shale Royalties 10, Inc. ("Shale 10") a Dallas, Texas-based Delaware corporation that raised approximately $29.1 million from 496 investors, beginning in February 2008. The directors of Shale 10 are Melbye, Coughlin, and Harrison. The executive officers of Shale 10 are Melbye, Coughlin, Harrison, Jordan and Miller. Melbye, Coughlin and Harrison are also beneficial owners of Shale 10;

n. Shale Royalties 12, Inc. ("Shale 12") a Dallas, Texas-based Delaware corporation that raised approximately $34.9 million from 488 investors, beginning in April 2008. The directors of Shale 12 are Melbye, Coughlin, and Harrison. The executive officers of Shale 12 are Melbye, Coughlin, Harrison, Jordan and Miller. Melbye, Coughlin and Harrison are also beneficial owners of Shale 12;

o. Shale Royalties 14, Inc. ("Shale 14") a Dallas, Texas-based Delaware corporation that raised approximately $31.1 million from 446 investors, beginning in July 2008. The directors of Shale 14 are Melbye, Coughlin, and Harrison. The executive officers of Shale 14 are Melbye, Coughlin, Harrison, Jordan and Miller. Melbye, Coughlin and Harrison are also beneficial owners of Shale 14;

p. Shale Royalties 15, Inc. ("Shale 15"), a Dallas, Texas-based Delaware corporation that raised approximately $27.5 million from 458 investors, beginning in July 2008. The directors of Shale 15 are Melbye, Coughlin, and Harrison. The executive officers of Shale 15 are Melbye, Coughlin, Harrison, Jordan and Miller. Melbye, Coughlin and Harrison are also beneficial owners of Shale 15;

q. Shale Royalties 16, Inc. ("Shale 16") a Dallas, Texas-based Delaware corporation that raised approximately $31.2 million from 466 investors,

beginning in July 2008. The directors of Shale 16 are Melbye, Coughlin, and Harrison. The executive officers of Shale 16 are Melbye, Coughlin, Harrison, Jordan and Miller. Melbye, Coughlin and Harrison are also beneficial owners of Shale 16;

r. Shale Royalties 17, Inc. ("Shale 17") a Dallas, Texas-based Delaware corporation that raised approximately $30.5 million from 492 investors, beginning in August 2008. The directors of Shale 17 are Melbye, Coughlin, and Harrison. The executive officers of Shale 17 are Melbye, Coughlin, Harrison, Jordan and Miller. Melbye, Coughlin and Harrison are also beneficial owners of Shale 17;

s. Shale Royalties 18, Inc. ("Shale 18") a Dallas, Texas-based Delaware corporation that raised approximately $24.4 million from 306 investors, beginning in October 2008. The directors of Shale 18 are Melbye, Coughlin, and Harrison. The executive officers of Shale 18 are Melbye, Coughlin, Harrison, Jordan and Miller;

t. Shale Royalties 19, Inc. ("Shale 19") a Dallas, Texas-based Delaware corporation that raised approximately $12.2 million from 194 investors, beginning in October 2008. The directors of Shale 19 are Melbye, Coughlin, and Harrison. The executive officers of Shale 19 are Melbye, Coughlin, Harrison, Jordan and Miller;

u. Shale Royalties 20, Inc. ("Shale 20") a Dallas, Texas-based Delaware corporation that raised approximately $6.8 million from 91 investors, beginning in October 2008. The directors of Shale 20 are Melbye, Coughlin, and Harrison. The executive officers of Shale 20 are Melbye, Coughlin, Harrison, Jordan, Miller and Dennis Palmer.

71. Provident Royalties, PAM and the Rule 506 Entities are collectively referred to as the "Provident Entities." The Provident Management Group and the Provident Entities are collectively referred to as the "Provident Group." Provident Royalties and the Rule 506 Entities are all debtors in the jointly administered bankruptcy, Case No. 09-33886-HDH-11 and may be referred to as "Debtors" herein.

## VIII. FACTUAL BACKGROUND

### A. The Ponzi Scheme.

72. The Debtors and PAM, as Managing Dealer, conducted each Offering through a syndicate of participating broker-dealers across the country that executed participation

agreements with PAM, including the Broker Defendants. PAM employed wholesalers that assisted the Broker Defendants with product training. PAM also worked with the Broker Defendants in providing to individual investors sales and marketing materials designed to encourage the purchase of Provident Securities. The Broker Defendants attended sales presentations for the Offerings in Dallas, Texas at the expense of PAM. On information and belief, the Broker Defendants did not conduct any independent investigation into the Provident Group and failed to exercise independent judgment concerning the Offerings.

73. Each of the Broker Defendants offered, sold or acted as a seller of Provident Securities purchased by the investors represented by the Trustee. The Broker Defendants, and other broker-dealers, raised approximately $485 million from over 7,700 investors, which was paid into accounts held in Texas banks between 2006 and 2009.

74. Approximately $34 million of the Debtors' money was paid to the broker-dealers as fees and/or commissions for selling Provident Securities. The Broker Defendants received fees and/or commissions for soliciting investors in these Offerings, including a syndication fee and a specific fee related to due diligence that was purportedly performed in connection with the Offerings. For example, the PPM for Shale 12 stated:

> Syndication Fee. The proceeds of this offering will be used to pay a non-accountable due diligence fee of 1.5% of the proceeds received in this offering to Provident Asset Management, LLC, a securities broker/dealer which is an Affiliate of the Corporation. The Corporation will also pay a non-accountable syndication management fee of 3% of the proceeds of the offering to Provident Asset Management, LLC as Managing Dealer.
>
> Sales Commissions and Due Diligence Fees. The Corporation will pay an 8% sales commission plus a 1% due diligence fee on the amount of subscription proceeds for Preferred Stock Series A to the Managing Dealer. The Corporation will pay a 6% sales commission plus a 1% due diligence fee on the amount of subscription proceeds for the Preferred Stock Series B to the Managing Dealer. The amount reflected above assumes that only

> Preferred Stock Series A is sold in this offering. The Managing Dealer will pay the sales commission and due diligence fee to other securities broker/dealers for subscriptions received through such broker/dealers.

An identical or nearly-identical statement was included in the PPMs for the other Offerings.

75. The Broker Defendants negligently and/or grossly negligently participated in the drafting, preparation, approval due diligence and/or dissemination of various materially false and misleading statements contained in the PPMs issued by the Provident Group. The Broker Defendants were paid commissions, due diligence fees and syndication fees in connection with the Offerings. The Broker Defendants, as statutory sellers, had responsibility for the truth and accuracy of the statements contained in the PPMs issued and relied upon.

76. For each of the Offerings, the Broker Defendants disseminated a substantially identical PPM describing the nature of the investment and solicited funds from investors. These Offerings, which took place over an approximate 30 month period, were limited to 500 investors each. Most of the Offerings consisted of two series of non-convertible redeemable cumulative preferred stock, Series A and Series B (the "Preferred Stock"). Several of the early Offerings were for limited or general partnership interests that also purported to pay distributions to investors on comparable terms. The remaining Offerings were supposed to pay investors a Preferred Stock dividend monthly, beginning four months after the initial investment. Promised returns ranged from 14-18% per year.

77. Shale II through Shale 5 offered Class A Preferred Stock that was supposed to pay 1.5% per month for 24 months. Shale 6 through Shale 17 issued Class A Preferred Stock that was supposed to pay 1.5% per month for 36 months and Class B Preferred Stock that was supposed to pay 1.25% per month for 24 months. Shale 18 through Shale 20 issued Class A Preferred Stock that was supposed to pay 1.375% per month for 48 months, and Class B

Preferred Stock that was supposed to pay 1.167% per month for 36 months. Dividends were supposed to be paid monthly, beginning four months after the initial investment.

78. At the end of the redemption period, the Rule 506 Entity would buy back investors' interests for the redemption price, which was the value of the initial principal invested plus any accrued dividends. For example, redemptions for Shale II, a $9.755 million offering, were scheduled to begin as early as September 2008, two years after the original offering commenced. Numerous additional redemptions were scheduled to commence early in 2009.

79. The Offerings by the Rule 506 Entities were virtually identical in their terms, had the same investment purpose, and took place continuously over a 30 month period. The periods of many of the Offerings overlapped others. Each Offering was also limited to 500 investors and to varying dollar amounts, and as an offering would approach a limit, the next Rule 506 Entity would be created.

**B. Materially False Statements and Omissions in the PPMs.**

80. The Offerings were nearly identical in their terms and stated investment goals. The PPM for Shale 12 presented the following business plan:

> The Corporation was organized to engage in all aspects of the oil and gas business, including acquiring real estate, oil and gas leases and mineral interests, and conducting exploration and development activities. The Corporation intends to acquire a combination of various producing and non-producing mineral interests [including royalty interests and working interests] in real property located within the United States. The Corporation may acquire oil and gas leases and subsequently farm-out or sublease such leases. The Corporation may acquire real estate, including surface rights, and subsequently hold or sever and sell the surface rights. The Corporation may acquire real estate, mineral interests and leases from affiliates of the Corporation or may sell real estate, mineral interests or leases to affiliates. The Corporation anticipates that its properties will be developed by oil and gas exploration and development companies, which may include affiliates of the Corporation. The Corporation may participate in oil and gas drilling programs, directly as a working interest owner or indirectly

> through investment in others. The Corporation may issue and sell additional securities, sell assets, or incur debt, to finance its activities or to participate on or redeem the Preferred Stock.

An identical or nearly identical statement was included in the PPMs for the other Rule 506 Entities.

81. The PPM for Shale 12 also represented that the proceeds from the Offerings would be used in the following manner:

> Proceeds of the offering are intended to be used primarily to acquire Properties, and may be used to pay intangible Property Acquisition Costs, which may include an allocated portion of costs incurred by affiliates. The Corporation will use the proceeds of the offering to pay organization and offering costs, to pay non-accountable due diligence and syndication fees and sales commissions to securities broker/dealers, including an affiliate of the Corporation, and to implement its plan of business.

An identical or nearly identical statement was included in the PPMs for the other Rule 506 Entities.

82. Each of the PPMs represented that invested funds would belong to the Rule 506 Entity at issue and would be placed in a separate account belonging to that Rule 506 Entity. Each PPM included a chart setting forth the use of proceeds from that Offering, indicating the percentage of the investors' funds dedicated to oil and gas investments. For example, in Shale 12, the PPM indicated that 86% of investor proceeds were designated for oil and gas investments.

83. Under "Oil and Gas Investments," the PPM stated:

> The proceeds of the Offering, after payment of expenses, fees and commissions, will be used to implement the Corporation's plan of business. Proceeds will be used primarily to acquire Properties and may be used to pay overhead and administrative expenses and Property Acquisition Costs.

84. The PPMs contained untrue statements of material facts and omitted material facts necessary to make the statements in the PPMs not misleading, in light of the circumstances under which they were made, because:

a. The Broker Defendants should have known and disclosed that Provident was not using the proceeds from the Offerings to invest in the oil and gas business at the amounts reported to investors;

b. Less than half of investors' funds were used for the purposes stated in the PPMs;

c. Investors' funds received in connection with one Offering were commingled with funds received from investors in other Offerings;

d. Funds received from later investors were used to pay dividends and returns of capital to earlier investors;

e. The Broker Defendants failed to obtain audited financial statements from Provident, which would have disclosed the financial mismanagement of the Provident Entities;

f. The Broker Defendants failed to disclose an utter lack of financial transparency as to the financial performance and soundness of previous Offerings;

g. The Broker Defendants failed to disclose that the Provident Entities lacked adequate internal controls over financial and accounting functions;

h. The Broker Defendants failed to investigate and disclose to investors numerous undocumented and undisclosed inter-company transactions where funds from one Rule 506 Entity were loaned to another Rule 506 Entity for purchases of leases or payment of dividends; and

i. The Broker Defendants failed to disclose to investors that millions of dollars of investors' funds were paid to a firm owned by Blimline for properties, without receiving adequate title documentation or value.

85. The Broker Defendants failed to disclose the sources of funds used to pay distributions and dividends to investors. The PPMs did not disclose whether any revenues generated by the Rule 506 Entities were used to pay investors, or whether loan proceeds, income generated from properties, sales of assets, funds from investors in other Rule 506 Entities or commingled funds were used to make distributions. Also, the PPMs generally disclosed that

distributions would be made in accordance with the Texas Limited Liability Act, which provides that "a limited liability company may not make a distribution if . . . the company's total liabilities exceed the value of the company's total assets." Thus, every time a distribution was made to investors it contained a misrepresentation that the Rule 506 Entities' assets exceeded their liabilities.

86. Failure to include information regarding the source of funds for previous dividends and distributions was misleading to investors because it created a false impression of viability. The failure to include the true source of funds for distributions misled investors about the relative success of earlier Offerings and whether the Provident Entities could generate any true income. Investors would have found it important to know that their funds were not being invested as represented in the PPMs and other materials provided for the Offerings. Investors would have also found it important to know that their funds were being used to repay earlier investors.

87. Blimline's background and involvement in the management of the Provident Group was not disclosed either. None of the material facts with respect to Provident Royalties' improper financial dealings with Blimline, the undocumented loans and transfers, and the Michigan consent order and cease and desist order were disclosed to investors. As set forth above, Blimline has since pleaded guilty to criminal violations of 18 U.S.C. § 1341 in connection with his role in the Provident Ponzi Scheme. *See* Blimline Criminal Plea Documents in *United States of America v. Joseph Blimline*, Case No. 4:10 CR-137, in the United States District Court for the Eastern District of Texas.

88. The Broker Defendants did not disclose to investors that the Provident Entities needed to use proceeds from later Offerings to pay dividends to investors in other earlier

Offerings. The Provident Group transferred assets and funds from one Rule 506 Entity to another to make dividend payments in order to give the appearance that earlier investors were being paid returns on their investments. In fact, earlier investors, who had been told that roughly 86% of their funds would be invested in oil and gas assets, were paid returns with funds from later investors. Investors were not informed that far less than 86% of investor funds had actually been invested in oil and gas assets and that the Provident Entities did not have the financial ability to pay dividends and redemptions.

89. The Broker Defendants also did not disclose to investors that as of October 31, 2008, the Rule 506 Entities and the Provident Group's financial statements reflected a loss of $7,572,699. The Broker Defendants failed to disclose that oil and gas revenue for the Provident Group dropped substantially from August 2008 to October 2008. With sustained losses, negative retained earnings and declining asset values, the Provident Entities did not have sufficient resources to pay dividends. Neither the Provident Entities nor the Broker Defendants disclosed to the investors in the PPMs, or any other document, that there were insufficient resources to pay returns promised to investors.

90. The Broker Defendants also did not disclose the improper business practices of Blimline. Specifically, Provident Royalties, through the Rule 506 Entities and otherwise, advanced tens of millions of dollars to Blimline and a series of approximately 31 entities he operated and controlled for the purported purchase of oil and gas interests. In fact, Blimline's acquisitions were neither strategically targeted nor acquired at a fair and reasonable price. In many cases, no land or mineral acquisition took place at all.

91. Blimline would acquire properties at prices far greater than the fair market value of the properties and, in many cases, he would charge Provident Royalties a higher price than he

actually paid. On information and belief, beginning in December 2007, Blimline obtained more than $20 million in loans from Provident Royalties. The loans were supposedly short term and for no stated purpose. It is believed that the loans were not actually repaid in full with separate consideration.

92. Blimline's involvement with the Provident Group and the improper practices associated therewith were material facts not disclosed to individual investors.

**C. What the Broker Defendants Were Supposed To Do.**

93. A broker-dealer that recommends a security is under a duty to conduct a reasonable investigation concerning that security and the issuer's representations about it. Each broker-dealer has a "special relationship" with its customer. The special relationship arises, in part, from the fact that in recommending the security, the broker-dealer represents to the customer that a "reasonable investigation has been made and that [its] recommendation rests on the conclusions based on such investigation."

94. Broker-dealers must conduct a reasonable investigation and engage in due diligence sufficient to support the recommendation made to the customer. This is doubly true for the Defendants who received additional payments as due diligence fees for purportedly conducting "due diligence." The scope and depth of the investigation is controlled, in part, by the nature of the recommendation, the role of the broker in the transaction, the knowledge and relationship to the issuer and the size and stability of the issuer. The presence of "red flags" should alert the broker-dealer to the need for further inquiry.

95. When a broker-dealer lacks essential information about an issuer or the securities being offered, the broker-dealer must disclose this fact as well as the risks that arise from the lack of information. Importantly, a broker-dealer may not rely on the information provided by the issuer and its counsel in lieu of conducting its own reasonable investigation. Broker-dealers

must exercise a "high degree of care" in investigating and independently verifying an issuer's representations and claims. The fact that a broker-dealer's customers may be sophisticated and knowledgeable does not obviate the need and duty to investigate.

96. Broker-dealers that are affiliated with, distribute or that engage in the preparation of a private placement memorandum are especially scrutinized. Broker-dealers must resolve any conflicts of interest that may compromise an independent investigation and disclose the nature and existence of potential conflicts to the customer, particularly since the affiliation with the issuer may promote a misunderstanding with some customers that the broker-dealer has a special expertise concerning the issuer.

97. Broker-dealers are also responsible for retaining records documenting both the process and results of their investigations. Such records should include descriptions of meetings conducted, documents or other information reviewed, the date of certain events and the individuals involved in the investigation.

98. The Broker Defendants miserably failed to follow these requirements and uphold their fiduciary obligations. Had the Broker Defendants conducted reasonable investigations, engaged in actual due diligence, disclosed their lack of real information about Provident Royalties and their potential or actual conflicts of interest, investors would have avoided millions of dollars of losses.

## IX. CAUSES OF ACTION

### COUNT 1: Avoidance and Recovery of Fraudulent Transfers Pursuant to 11 U.S.C. §§ 548, 550 and the Texas Uniform Fraudulent Transfer Act Against Broker-Dealer Defendants

99. The Trustee repeats and realleges the allegations set forth in all preceding paragraphs of this Complaint, as if fully set forth herein.

100. Within four years of the Petition Date, the Broker-Dealer Defendants received transfers totaling approximately $36,275,348. The specific transfers made to each Defendant, including the date and amount of transfer, are detailed on **Exhibit A** attached hereto and incorporated herein as if fully set forth.

101. The transfers constituted transfers of interests of the Rule 506 Entities in property. The PPMs specifically provided that the funds investors sent directly to the Rule 506 Entities became property of those respective entities. The investors paid the funds directly to the Rule 506 Entities, and the Rule 506 exercised control over those funds, which established the funds, including the percentages paid ultimately to the Broker Defendants as commissions, as property of the Debtors' estates.

102. Debtors would transfer, without consideration, funds into PAM. The funds were commingled at PAM with other funds. PAM operated as a conduit of the funds to each of the Broker Defendants when it paid monies to them for alleged commissions. PAM did not exercise control over the funds. As a result, each of the Broker Defendants was an initial transferee. In the alternative, if PAM was not a conduit, each of the Broker Defendants took the transfers as a subsequent transferee without good faith and provided no value to the Debtors.

103. Each of these transfers was made with the intent to hinder, delay or defraud creditors and/or was made for lack of reasonably equivalent value. In addition, the transfers were made while the Debtors were in dire financial straits, were insolvent or were left with unreasonably small capital after the payments. The transfers made to the Broker Defendants constitute recoverable transfers made to either initial or subsequent transferees of interests in the Debtors' property.

104. The transfers were made as part of a syndication scheme to a national network of broker-dealers as compensation in connection with offerings and sales of Provident Securities, which turned out to be fraudulent. The transfers were made under the guise of a commission or syndication fee, but the Rule 506 Entities did not receive reasonably equivalent value for these "commissions" and "fees." The transfers were made to Broker Defendants who did not take them for value or in good faith. The Broker Defendants grossly negligent actions and failure to adhere to their fiduciary standards also vitiates any good faith on their part.

105. Moreover, Provident Royalties was operated as a Ponzi scheme. Thus, the commission payments to the Defendants were made with the actual intent to hinder, delay, or defraud Provident Royalties' creditors as a matter of law.

106. Further, the transfers were made when the Rule 506 Entities were in dire financial straits. Since they were operated as a Ponzi scheme, the Rule 506 Entities were insolvent *ab initio*, or in the alternative, they become insolvent shortly after the transfers. The Rule 506 Entities were engaged in business or transactions, or were about to engage in business or transactions, for which any property remaining with the Rule 506 Entities was unreasonably small capital. The Rule 506 Entities intended to incur, or believed they would incur, debts that would be beyond the Rule 506 Entities' ability to pay as such debts matured. Accordingly, the transfers are fraudulent under section 24.005(a)(1) of the Texas Business and Commerce Code and (b) are voidable under section 24.008(a)(1) of the Texas Business and Commerce Code.

107. Pursuant to 11 U.S.C. §§ 544(b) and 548, the Trustee asks the Court to avoid the transfers as voidable fraudulent transfers under applicable state law. Pursuant to 11 U.S.C. § 550, the Trustee may recover the value of the transferred property from Defendants, whether it is

construed as an initial, immediate or mediate transferee. The Trustee prays for recovery of the voidable commission payments or damages in an amount equivalent to their value.

## X. CLAIMS STAYED AGAINST BROKER DEFENDANTS PURSUANT TO AUGUST 4, 2011 COURT ORDER COMPELLING ARBITRATION

### COUNT 2: Breach of Fiduciary Duty Against All Broker Defendants

108. The Trustee, as the representative of the PR Liquidating Trust that is the holder of the assigned investor claims, repeats and realleges the factual allegations set forth in all preceding paragraphs of this Complaint, as if fully set forth herein.

109. The Broker Defendants offered, solicited the sale of and/or sold Provident Securities to investors. Each Broker Defendant acted as a fiduciary to the individual investors that purchased Provident Securities from them in the Offerings. As a fiduciary, the Broker Defendants owed fiduciary duties to the individual investors, including but not limited to the duties of loyalty, care, candor and fidelity. The Broker Defendants breached all of these duties. The Broker Defendants owed due diligence obligations to investors in connection with their offer and sale of Provident Securities. In breach of these obligations, the Broker Defendants did not conduct proper or reasonable due diligence of the Provident Entities. Whenever it is alleged that the Broker Defendants acted or failed to act and whenever it is alleged that the Broker Defendants committed negligence or gross negligence, it is alleged that they did so by their officers, directors, employees, principals and vice principals acting within the course and scope of their employment, agency or other relationship.

110. FINRA Rule 2310 regarding Direct Participation Programs states that a registered broker-dealer must have a reasonable basis for believing that the investment at issue is suitable for the investor. Because the Offerings were part of a scheme (operated by the directors and officers of the Provident Group) and the Broker Defendants failed to perform adequate due

diligence, among other things, the Broker Defendants did not have a reasonable basis to believe the investment was suitable as required under FINRA Rule 2310. As part of their obligations to ensure the investments were suitable, the Broker Defendants needed to match the sophistication and financial wherewithal of the individual investors to the investment. On information and belief, the Broker Defendants gerrymandered the information regarding the investors relating to the investment subscriptions to enable ineligible or non-qualified investors to participate in the Rule 506 Entities. The Broker Defendants were negligent and/or grossly negligent in their actions to place ineligible investors in a highly risky and, ultimately, fraudulent investment. The Broker Defendants should not have solicited and offered to sell Provident Securities to the individual investors, much less ignore essential qualification requirements for investors to participate.

111. As part of their fiduciary and due diligence obligations, the Broker Defendants should have evaluated the Provident Entities' financial statements, financial performance, and future financial prospects, which should have included a review of the Provident Entities' financial statements as well as general financial issues such as profits, revenue, budgets, projected revenues, the use of proceeds and purchase of properties, and the overall financial controls at the companies. Proper due diligence would have made apparent that the PPMs were materially misleading. The Broker Defendants' failure to conduct adequate or reasonable due diligence, that would have uncovered these numerous financial red flags and lack of financial statement transparency, allowed the false and misleading PPMs to be distributed.

112. The Broker Defendants did not fulfill their obligations under FINRA Rule 2310 or their fiduciary duties to investigate the use of investor funds and the source of paid dividends in

previous Offerings, despite numerous red flags regarding the Offerings unsuitability. Among the red flags that should have triggered the Broker Defendants to increase due diligence were:

a. the absence of any audited financial statements for the Provident Entities;

b. the lack of any detail regarding the sources of funds used to pay investors in other Rule 506 Entities;

c. the inability of Provident Royalties to timely account for the use of investor proceeds;

d. the massive borrowing undertaken by affiliates;

e. the purchase of oil and gas interests in amounts far less than that which was received from investors;

f. the lack of internal financial controls and the improper accounting related to inter-company transactions.

113. The Broker Defendants breached their fiduciary duties by failing to engage in reasonable due diligence and failing to disclose material facts regarding the PPMs and the Provident Entities' true financial condition. As a result of these breaches, the investors were harmed and were caused damages. The Trustee, as the representative of the PR Liquidating Trust that is the holder of the assigned investor claims, sues to recover for breach of fiduciary duty.

**COUNT 3: Breach of Contract Against Broker Defendants**

114. The Trustee, as the representative of the PR Liquidating Trust that is the holder of the assigned investor claims, repeats and realleges the factual allegations set forth in all preceding paragraphs of this Complaint, as if fully set forth herein.

115. The Broker Defendants entered into contracts with the individual investors. The individual investors entered into an agreement with the understanding and belief that the Broker Defendants would fulfill the terms of their contract, place them into suitable investments, and

follow all rules and regulations cited in or otherwise applicable to said contracts and to the relationship between the Broker Defendants and the individual investors.

116. Inherent in all contracts is a requirement of good faith and fair dealing. Through its dealings in selling interests in Provident Royalties, the Broker Defendants breached their contracts with the individual investors. The breach of contract caused the individual investors to suffer damages. The Trustee, as the representative of the PR Liquidating Trust that is the holder of the assigned investor claims, sues to recover for these and any other breaches of contract.

**COUNT 4: Negligence and Gross Negligence Against Broker Defendants**

117. The Trustee, as the representative of the PR Liquidating Trust that is the holder of the assigned investor claims, repeats and realleges the factual allegations set forth in all preceding paragraphs of this Complaint, as if fully set forth herein.

118. The Broker Defendants owed the duty of due care, the duty not to be negligent to the investors, including but not limited to their due diligence obligations to investors in connection with their offer and sale of Provident Securities. In breach of these obligations, the Broker Defendants did not conduct proper or reasonable due diligence of the Provident Entities. The Broker Defendants failure to conduct a proper investigation or engage in reasonable due diligence was negligent and/or grossly negligent given the facts and circumstances.

119. In addition to their duty to investigate or conduct due diligence under normal circumstances, sufficient red flags existed in this case that should have triggered the Broker Defendants to increase due diligence. At least the following red flags existed:

a. the absence of any audited financial statements for the Provident Entities;

b. the lack of any detail regarding the sources of funds used to pay investors in other Rule 506 Entities;

c. the inability of Provident Royalties to timely account for the use of investor proceeds;

d. the massive borrowing undertaken by affiliates;

e. the purchase of oil and gas interests in amounts far less than that which was received from investors;

f. the lack of internal financial controls and the improper accounting related to inter-company transactions.

120. Despite these red flags, the Broker Defendants continually ignored their obligations to conduct real, meaningful investigations of the Provident Group. The failure of the Broker Defendants to conduct due diligence constituted negligence and gross negligence and was a proximate cause of massive financial injuries to the investors. Whenever it is alleged that the Broker Defendants acted or failed to act and whenever it is alleged that the Broker Defendants committed negligence or gross negligence, it is alleged that they did so by their officers, directors, employees, principals and vice principals acting within the course and scope of their employment, agency or other relationship. The Trustee, as the representative of the PR Liquidating Trust that is the holder of the assigned investor claims, sues to recover for the negligence and gross negligence of the Broker Defendants.

**COUNT 5: Negligent Misrepresentation Against Broker Defendants**

121. The Trustee, as the representative of the PR Liquidating Trust that is the holder of the assigned investor claims, repeats and realleges the factual allegations set forth in all preceding paragraphs of this Complaint, as if fully set forth herein.

122. The Broker Defendants made numerous misrepresentations to individual investors both in the course of the broker-customer relationship and in transactions in which each Broker Defendant had a financial interest. Specifically, each Broker Defendant received a commission and syndication fee for every investment sold on behalf of a Rule 506 Entity.

123. The Broker Defendants failed to exercise reasonable care or competence in obtaining or communicating the information. Despite an affirmative duty to conduct reasonable

due diligence and provide fully informed information to their customers, the Broker Defendants failed to do so and passed information to the investors that they should have known was false and misleading. Whenever it is alleged that the Broker Defendants acted or failed to act and whenever it is alleged that the Broker Defendants committed negligence or gross negligence, it is alleged that they did so by their officers, directors, employees, principals and vice principals acting within the course and scope of their employment, agency or other relationship.

124. The investors justifiably relied on the information provided to them and the Broker Defendants' negligent misrepresentations were the proximate cause of the investors' injuries. If the Broker Defendants had conducted due diligence and investigated (a) the Rule 506 Entities and their management; (b) the business prospects of the Rule 506 Entities; (c) the assets held by or to be acquired by the Rule 506 Entities; (d) the claims being made by the Rule 506 Entities; and (e) the intended use of proceeds of the Offerings, then the true financial condition of the Provident Group would have been revealed. For example, investors would have found it important to know that their proceeds were being used to repay earlier investors, that the oil and gas assets of the Provident Group were vastly overstated and that the prospects for future revenues were dismal. A reasonable investigation would have revealed these facts and prevented injury. A reasonable investigation or a full disclosure after a reasonable investigation would have prevented the individual investors from entering into the contract with the Broker Defendants *ab initio.* The Trustee, as the representative of the PR Liquidating Trust that is the holder of the assigned investor claims, sues the Broker Defendants for the recovery of all damages caused by their negligent misrepresentations and avoidance of any onerous adhesion terms in any contract with the Broker Defendants.

**COUNT 6: Violations of the 1933 Securities Act Against Broker Defendants**

125. The Trustee, as the representative of the PR Liquidating Trust that is the holder of the assigned investor claims, repeats and realleges the factual allegations set forth in all preceding paragraphs of this Complaint, as if fully set forth herein.

126. 15 U.S.C. § 77l provides that "[a]ny person who . . . offers or sells a security . . . by means of a prospectus or oral communication, which includes an untrue statement of material fact or omits to state material fact necessary in order to make the statements . . . not misleading . . . and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable . . . to the person purchasing such security . . . to recover the consideration paid for such security with interest thereon . . . ." The Broker Defendants' negligent and grossly negligent acts violated this statute.

127. Each individual investor named in this Complaint purchased securities directly in the Offerings and sues to recover from the Broker Defendants. The Trustee, as the representative of the PR Liquidating Trust that is the holder of the assigned investor claims, has standing and the requisite authority to sue on their behalf.

128. In grossly negligent disregard of their duties, the Broker Defendants participated in drafting, preparing, approving, and/or disseminating various materially false and misleading statements in communication with investors regarding the investments. The Broker Defendants negligently failed to disclose numerous activities of Provident Royalties and the Rule 506 Entities, which would have given a reasonable investor caution. In the exercise of reasonable care, the Broker Defendants would and should have known or discovered that the PPMs and other materials provided to investors were false and misleading. Had the Broker Defendants exercised proper and reasonable care they could have prevented the dissemination of false

information. The Broker Defendants role in the offer and sale of securities predicated on false and misleading statements subjects them to liability for the consideration paid for the security by each investor. The damages are in excess of $251 million.

129. Whenever it is alleged that the Broker Defendants acted or failed to act and whenever it is alleged that the Broker Defendants committed negligence or gross negligence, it is alleged that they did so by their officers, directors, employees, principals and vice principals acting within the course and scope of their employment, agency or other relationship.

130. The individual investors could not with the exercise of reasonable diligence have discovered the fraud and as a result the injury was inherently indiscoverable. Moreover, the investors were relying on representations from both the Broker Defendants and the Provident Group that were made by fiduciaries and many of them were continuing to receive distributions even though the assets of the Rule 506 Entities no longer exceeded their liabilities. Injuries arising from a breach of fiduciary duty are inherently undiscoverable. The injury, however, here is objectively verifiable because the true financial condition of the Provident Group and the Rule 506 Entities can be ascertained from the books and records of the companies.

131. The Broker Defendants tortious actions were continuing in nature. Each offer, sale or solicitation of investor funds constitute tortious action that continuously repeated injury to the investors and that was caused by repetitive wrongful acts. In addition, the underlying misrepresentations contained in the PPMs were continuing misrepresentations and constitute continuing wrongs and not just a continuing injury. Accordingly, the accrual date of all applicable limitations periods was deferred until such time as the misrepresentations, offers, sales and solicitations of Provident Securities ceased. The Trustee, as the representative of the PR

Liquidating Trust that is the holder of the assigned investor claims, hereby sues for recovery under said Act.

**<u>COUNT 7</u>: Violations of the Texas Securities Act**

132. The Trustee, as the representative of the PR Liquidating Trust that is the holder of the assigned investor claims, hereby repeats and re-alleges the factual allegations set forth in all preceding paragraphs of this Complaint, as if fully set forth herein.

133. The Broker Defendants were offerors and/or sellers within the meaning of the Texas Securities Act because they sold Provident Securities to the individual investor plaintiffs and/or actively solicited the sale of Provident Securities to the individual investor plaintiffs, pursuant to PPMs, which turned out to be materially false and misleading. The Broker Defendants received fees, including commissions and due diligence fees, for their sales of Provident Securities. Whenever it is alleged that the Broker Defendants acted or failed to act and whenever it is alleged that the Broker Defendants committed negligence or gross negligence, it is alleged that they did so by their officers, directors, employees, principals and vice principals acting within the course and scope of their employment, agency or other relationship.

134. Individual investors that have assigned their claims to the Trustee purchased Provident Securities pursuant to the materially untrue statements and omissions of material facts in the PPMs disseminated by the Broker Defendants, and did not know, and in the exercise of reasonable diligence could not have known, of the untruths and omissions contained therein.

135. The individual investors have suffered damages as a result of the wrongs herein in an amount to be proven at trial.

136. The Broker Defendants are liable under section 33(A)(2) of the Texas Securities Act for damages in connection with the investors purchases of Provident Securities. The investors hereby tender to the Broker Defendants those Provident Securities that they continue to

own, in return for the consideration paid for those Provident Securities together with interest thereon. The investors that have sold their Provident Securities demand rescission damages. The Trustee, as the representative of the PR Liquidating Trust that is the holder of the assigned investor claims, sues to recover for rescission damages and any other damages available under the Texas Securities Act.

**COUNT 8: Attorneys' Fees**

137. The Trustee in all capacities in which an action for attorneys' fees may be brought herein, repeats and realleges the factual allegations set forth in all preceding paragraphs of this Complaint, as if fully set forth herein.

138. The Broker Defendants are liable for all necessary and reasonable attorneys' fees allowable at law or equity. The Trustee in all said capacities specifically pleads and requests his reasonable attorneys' fees.

**COUNT 9: Exemplary Damages**

139. The Trustee in all capacities in which an action for exemplary damages may be brought herein, repeats and realleges the factual allegations set forth in all preceding paragraphs of this Complaint, as if fully set forth herein.

140. The Broker Defendants, by and through their grossly negligent acts and omissions, are responsible for exemplary or punitive damages in an amount to be proven at trial. The Broker Defendants, by and through their conduct, also ratified and approved the grossly negligent and/or recklessly made misrepresentations and, as a result, are liable for exemplary damages. Trustee in all of said capacities specifically pleads and requests the award of exemplary damages in an amount consistent with law and equity.

## XI. PRAYER FOR RELIEF

WHEREFORE, Milo H. Segner, Jr., Trustee of the PR Liquidating Trust, respectfully requests that, upon trial of this matter, the Court enter a judgment against the Defendants:

a. avoiding each of the transfers for which the Trustee has sought avoidance and ordering the return to the Trust of the subject money and/or property;

b. requiring the Broker Defendants to forfeit all payments received from the Rule 506 Entities or their affiliated companies as subsequent transferees of avoidable transfers or award damages in the minimum amount of $34 million plus the maximum allowable interest thereon;

c. awarding damages in the minimum amount of $251 million plus the maximum allowable interest for the investors;

d. because many of the acts and failures to act described above were committed by grossly negligent conduct and with a conscious indifference to the rights of others, awarding punitive or exemplary damages;

e. awarding pre-judgment and post-judgment interest on the foregoing amounts at the maximum rate permitted by contract, law or equity;

f. awarding the Trustee, in any and all capacities as necessary, his costs of suit, including reasonable attorneys' fees; and/or;

g. awarding the Trustee, in any and all capacities, such other and further relief as is appropriate in the circumstances.

Respectfully submitted,

/s/ Sean J. McCaffity
Michael R. Rochelle
Texas Bar No. 17126700
Christopher B. Harper
Texas Bar No. 09025500

Andrew B. Sommerman
Texas Bar No. 18842150
George (Tex) Quesada
Texas Bar No. 16427750

Scott M. DeWolf
Texas Bar No. 24009990
Sean J. McCaffity
Texas Bar No. 24013122
ROCHELLE MCCULLOUGH LLP
325 N. St. Paul, Suite 4500
Dallas, Texas 75201
P: (214) 953-0182
F: (214) 953-0185

SOMMERMAN & QUESADA, L.L.P.
3811 Turtle Creek Blvd., Suite 1400
Dallas, Texas 75219
P: (214) 720-0720
F: (214) 720-0184

Jerry C. Alexander
Texas Bar No. 00993500
Christopher A. Robison
Texas Bar No. 24035720
PASSMAN & JONES, P.C.
1201 Elm Street, Suite 2500
Dallas, Texas 75270-2599
P: (214) 742-2121
F: (214) 748-7949

Ken Johnson
Texas Bar No. 10746300
FLEMING & ASSOCIATES
1330 Post Oak Blvd, Suite 3030
Houston, Texas 77056-3019
P: (713) 621-7944
F: (713) 621-9638

**COUNSEL FOR THE LIQUIDATING TRUSTEE**